## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **PRIDE CENTRIC RESOURCES, INC, FORMERLY KNOWN AS PRIDE MARKETING AND PROCUREMENT, INC.** | § § § § § | **CIVIL ACTION NO. _____** |
| **Plaintiff,** | § § | |
| **v.** | § § | |
| **LAPORTE, A PROFESSIONAL ACCOUNTING CORPORATION, CHERYL HASPEL, TRACY TUFTS ANTHONY M. RUTLEDGE, TERRI TROYER, MICHAEL SIMON and CONTINENTAL CASUALTY COMPANY** | § § § § § § § § | |
| **Defendants.** | § | **JURY DEMAND** |

### ORIGINAL COMPLAINT OF PRIDE CENTRIC RESOURCES, INC.

PRIDE Centric Resources, Inc., formerly known as PRIDE Marketing and Procurement, Inc., respectfully files this Original Complaint against LaPorte, A Professional Accounting Corporation, Cheryl Haspel, Tracy Tufts, Anthony M. Rutledge, Terri Troyer, Michael Simon and Continental Casualty Company (collectively hereafter "Defendants or LaPorte").

### I.
### PARTIES

1. Plaintiff, PRIDE Centric Resources, Inc. ("PRIDE"), is a Delaware Corporation domiciled in and with its principal place of business in Arapahoe County, State of Colorado.

2. Defendant, LaPorte, A Professional Accounting Corporation ("LaPorte"), is a Louisiana Corporation domiciled in and with its principal place of business in the Parish of

Jefferson, State of Louisiana; LaPorte may be served through its counsel of record, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

3.   Cheryl Haspel ("Haspel"), a person of the full age of majority, who upon information and belief is domiciled in the Parish of St. Tammany, State of Louisiana. Haspel was at all material times employed by LaPorte and involved on the 2013 and/or 2014 audits of the financial statements of PRIDE. Cheryl Haspel may be served though her counsel, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

4.   Tracy Tufts ("Tufts"), a person of the full age of majority, who upon information and belief is domiciled in the Parish of Jefferson, State of Louisiana. Tufts was at all material times employed by LaPorte and involved on the 2013 and/or 2014 audits of the financial statements of PRIDE. Tufts may be served through her counsel, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

5.   Anthony M. Rutledge ("Rutledge"), a person of the full age of majority, who upon information and belief is domiciled in the Parish of St. Tammany, State of Louisiana. Rutledge was at all material times employed by LaPorte and involved on the 2013 and/or 2014 audits of the financial statements of PRIDE. Mr. Rutledge may be served through his counsel, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

6.   Defendant Terri Troyer ("Troyer"), a person of the full age of majority, who upon information and belief is domiciled in the Parish of Jefferson, State of Louisiana. Troyer was at

all material times employed by LaPorte and involved in the 2013 and/or 2014 audits of the financial statements of PRIDE and may be served through her counsel, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

7. Defendant, Michael Simon ("Simon"), a person of the full age of majority, who upon information and belief is domiciled in the Parish of Jefferson, State of Louisiana. Simon was at all material times employed by LaPorte and involved in the 2013 and/or 2014 audits of the financial statements of PRIDE and FSW and may be served through his counsel, Mr. Richard G. Duplantier, Galloway Johnson Tompkins Burr & Smith, 701 Poydras, 40th Floor, New Orleans, Louisiana 70139.

8. Defendant, Continental Casualty Company ("Continental"), was at all times material the liability insurer of LaPorte and is liable to PRIDE under the Louisiana Direct Action Statute, LA R.S. § 22:1269. Continental can be served with process through the Louisiana Secretary of State, 8585 Archives Ave., Baton Rouge, Louisiana 70809.

## II.
## JURISDICTION

9. This court has diversity jurisdiction over the parties pursuant to 28 U.S.C. §1332(a). No defendant is a citizen of the same state as Plaintiff, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10. Plaintiff, PRIDE, is a Delaware corporation with its principal place of business in the State of Colorado. All of the individual defendants reside in the State of Louisiana. Defendant, LaPorte, is a Louisiana corporation. Under 28 U.S.C. § 1332(c), Defendant Continental Casualty Company is deemed a citizen of every state and foreign state of

which the insured, LaPorte, is a citizen.  Therefore, Continental Casualty Company is a citizen of Louisiana for jurisdictional purposes.

### III.
### VENUE

11.       Under 28 U.S.C. § 1391(b)(2), venue is proper in the Eastern District of Louisiana because it is a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred…."

12.       Further, venue is proper in this judicial district pursuant to 28 U.S.C. § (b)(1) because all defendants reside in Louisiana, the state where the district is located and at least one of the defendants resides in the Eastern District of Louisiana.  All individual defendants are residents of Louisiana per 28 U.S.C. § 1391(c)(1).  As a corporation, LaPorte is deemed to reside in any judicial district where its contacts would be sufficient to subject it to personal jurisdiction at the time the action is commenced under 28 U.S.C. § 1391(c)(2).  LaPorte advertised, promoted, and supplied its services at all times relevant in the State of Louisiana and, more particularly, within the jurisdictional boundaries of the United States District Court for the Eastern District of Louisiana.  Continental Casualty Company is in the insurance business and provides liability insurance to insureds such as LaPorte.  It conducts business in the State of Louisiana.

### IV.
### BACKGROUND

13.       PRIDE is a member-owned cooperative that purchases foodservice equipment in large quantities in order to obtain savings obtained by buying large quantities of foodservice equipment for its member dealers. PRIDE has over 100 professional foodservice equipment and supply dealers located throughout the United States and Canada. PRIDE connects

foodservice equipment and supply dealers with manufacturers to obtain competitive purchasing for those dealers/customers. PRIDE was formed in 1989.

14.     Foodservicewarehouse.com, LLC ("FSW"), a former Delaware limited liability company, was formed in 2006 by approximately 80% of the shareholders of PRIDE to which it was related through this common ownership. The board of PRIDE and management committee of FSW shared a number of common members.

15.     LaPorte was the independent auditor for PRIDE and FSW, and LaPorte audited the financial statements of PRIDE and FSW for the years ended December 31, 2013 and 2014.

16.     Louis Puissegur, a former LaPorte CPA, was hired in or about early 2000 as the Chief Financial Officer for PRIDE. He was also the Chief Financial Officer of FSW beginning in or about 2007.

17.     LaPorte was engaged by PRIDE to perform audits of its financial statements for the years ended December 31, 2013 and December 31, 2014. These audits were performed by Defendant LaPorte during the summer of 2015.

18.     The Board of Directors of PRIDE relied on the audit opinions of LaPorte on the financial statements of PRIDE to enable it to make financial decisions in the best interest of PRIDE and its shareholders.

19.     In connection with this audit engagement, LaPorte issued its letters dated June 19, 2014 and June 19, 2015 to the Board of Directors and Members of PRIDE, promising to timely communicate, in writing, their discovery of any fraud involving senior management and other fraud causing a material misstatement of the financial statements, any instances of noncompliance with laws and regulations that might come to their attention, any significant

deficiencies or material weaknesses in internal control that might become known to them during the course of the audit, and any other matters arising from the audit deemed significant and relevant to the Board and the Members of PRIDE in their oversight of the financial reporting process. LaPorte further represented that it would "accumulate misstatements identified during the audit" other than those that were "clearly" trivial, and, at the end of the audit, inform the Board and the members of PRIDE of "all unrecorded misstatements aggregated by us in connection with our evaluation of our audit test results."

20.     LaPorte conducted its audit of the financial statements of PRIDE and issued its Independent Auditor's Reports on the Financial Statements of PRIDE as of December 31, 2013 and 2014 on September 14, 2015.

## LINE OF CREDIT GUARANTEED BY PRIDE

21.     FSW obtained a line of credit from IberiaBank in May 2010 and had its first draw in July 2010. The line was sparingly used until 2014. In or about late May 2014 FSW obtained an increase in the line of credit from $5 million to $10 million. IberiaBank, as a condition of the loan, required FSW to obtain the agreement of its related company, PRIDE, to provide a $5 million guaranty on the loan, which was provided. This line of credit was again increased in May 2015 from $10 million to $20 million with a corresponding increase in the PRIDE guaranty to $10 million. FSW's security for the line of credit consisted of its inventory and accounts receivables.

22.     As a further condition of the extension of this line of credit to FSW, IberiaBank required that it be provided with annual audited financial statements of both FSW and PRIDE. LaPorte was aware of this requirement and that IberiaBank was relying on LaPorte's audits for the continued extension of credit to FSW that was guaranteed by PRIDE.

23.     On or about December 22, 2015, and in reliance on LaPorte's Independent Auditor's Report dated September 14, 2015 on the consolidated financial statements of PRIDE and LaPorte's Independent Auditor's Report on the consolidated financial statements of FSW dated October 13, 2015, the Board of PRIDE agreed to increase PRIDE's guaranty of FSW's borrowing obligation to IberiaBank from $10,000,000 to $15,000,000.

24.     In mid-February 2016, PRIDE was informed by FSW that rather than earning a profit in 2015 as expected, FSW had suffered a loss expected to be in the range of $10 - $15 million. This information was communicated by FSW to IberiaBank which promptly foreclosed on its loan with FSW and then, without notice to PRIDE, swept all balances from the PRIDE bank accounts held by IberiaBank.  In order to obtain a release by IberiaBank of the PRIDE procurement cash accounts that held funds sent to PRIDE by PRIDE dealers to make payments for dealer purchases, PRIDE had to agree to pay an additional $3.5 million dollars to IberiaBank by May 15, 2016 pursuant to the guaranty. These amounts were in addition to the operating account balance that IberiaBank swept and did not return to PRIDE. The total paid to IberiaBank by PRIDE under its guaranty of the FSW loan was $15.7 million.

## FSW BANKRUPTCY

25.     On or about May 20, 2016, FSW filed for Chapter 11 Bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Louisiana. This filing has since been converted to a Chapter 7 liquidation proceeding.

## REBATE ADVANCES

26.     Beginning on or before January 1, 2015, PRIDE, without the knowledge of its board, began loaning funds to FSW as unapproved advances against future rebates to be earned. By June 2015, PRIDE had loaned to FSW an amount "just under" $5,000,000. These

loans, despite their clear materiality, were not disclosed by PRIDE in its related notes to the financial statements (referenced herein as "PRIDE's 2014-2013 Financial Statements") or by LaPorte in its September 14, 2015 Independent Auditor's Report on PRIDE's balance sheets as of December 31, 2014 and 2013. These loans, originally coded to the "Due from FSW" account were moved and reclassified at the end of June 2015 to the "Rebates Fee Held for Distribution" account. By September 29, 2015, this amount was in excess of $7,000,000. LaPorte, at a minimum, should have required PRIDE to disclose this material subsequent event in the 2014 audits of PRIDE's 2013-2014 Financial Statements.

**LOAN DEFAULT**

27.     Subsequent to PRIDE's agreement to increase the amount of its guaranty of FSW's loan with IberiaBank, PRIDE discovered that FSW had failed to make scheduled payments on its loan with IberiaBank since approximately June 2015, some seven months before PRIDE was asked to increase its guaranty to $15 million. This failure by FSW to make payments was an event of default under FSW's loan with IberiaBank, and was clearly material to PRIDE, and should have been disclosed by LaPorte as a material subsequent event in its audit of PRIDE's financial statements for the year ended December 31, 2014.

28.     At the time it issued its September 14, 2015 audit report on PRIDE's 2014-2013 Financial Statements, LaPorte knew or should have known that FSW was in default on its $21 million loan with IberiaBank, that FSW lacked the financial ability to continue performing its obligations on the loan, that FSW had not submitted its audited financial statements to the bank by September 15, 2015 and that its inventory and account receivables had been overstated and were not adequate security for the loan. LaPorte knew or should have known that FSW's inability to perform under the loan materially adversely affected PRIDE's potential liability on its

guaranty of the IberiaBank loan. Despite such knowledge, LaPorte failed to require PRIDE to disclose any of these material facts in its 2014-2013 Financial Statements and failed to raise this issue in its September 14, 2015 auditor's report regarding PRIDE's 2014-2013 Financial Statements.

## VENDOR GUARANTEES

29.     PRIDE, when placing orders for FSW, provided to its vendors certain procurement codes. These codes guaranteed payment by PRIDE for the order to the vendor. Accordingly, when FSW defaulted on its payment obligations to its vendors, PRIDE remained obligated under its guarantees to pay the vendors for FSW's unpaid orders.

30.     LaPorte understood that the procurement codes constituted a guaranty of payment and, during the course of its audits, failed to properly quantify and disclose these amounts as a contingent liability that PRIDE had guaranteed on behalf of FSW. Accordingly, LaPorte was aware but failed to require that PRIDE disclose that it was guaranteeing in excess of $10 million of FSW's purchases without any collateral from FSW for these guarantees by PRIDE.

## INSOLVENCY OF FSW

31.     LaPorte, despite having been made aware by at least September 14, 2015, that FSW's loan balance with IberiaBank as of December 31, 2014 was $18,639,140.00, and that its existing credit line was only $21,000,000, failed to disclose to PRIDE's Board of Directors in its September 14, 2015 auditor's report on PRIDE's 2014-2013 Financial Statements, that FSW lacked adequate available credit and operating capital to make payments on the line of credit guaranteed by PRIDE. This increase to $18,639,140 in the balance on FSW's line of credit (for

the year ending December 31, 2014) was particularly significant since the balance on FSW's line of credit for the year ending December 31, 2013 was only $1,850,000.

32.     PRIDE in its 2014-2013 Financial Statements disclosed in the Notes (Note No. 5) that PRIDE is a guarantor of FSW's $21 million line of credit, that the balance was $18,639,140 and that the line of credit was secured by FSW's inventory and accounts receivable. Despite the recognition that the line of credit was secured by FSW's inventory and accounts receivable, LaPorte failed to require PRIDE to disclose that FSW's inventory value was significantly overstated.

33.     LaPorte was, or should have been aware, in the exercise of the degree of care, skill, and diligence required by a reasonably prudent certified public accountant practicing in Metairie, Louisiana, that FSW did not have the ability to finance or pay for its ongoing operations, that it was in breach of its loan covenants—including the requirement of an audit by September 15, 2015, that it was borrowing undisclosed and unapproved advances against rebates, that it was relying on the credit and guarantees of PRIDE to remain in operation, and that these facts presented a going concern issue  for PRIDE – that required further examination to determine if, in fact, PRIDE was a viable business for the next twelve months. These findings were material and should have been disclosed to PRIDE.

**RELIANCE ON LAPORTE**

34.     Defendant LaPorte was aware or should have been aware at the time the engagement was undertaken by LaPorte that the audits of PRIDE and FSW's financial statements were to be made available to PRIDE for its use in connection with PRIDE'S decision to provide advances to FSW and to guarantee financial obligations of FSW. PRIDE's obligation to IberiaBank under the guaranty was specifically disclosed to LaPorte and LaPorte was aware

that PRIDE intended to rely upon LaPorte's audits of PRIDE's and FSW's financial statements in connection with the specific transactions described herein. LaPorte representatives had direct contact and communications with PRIDE's management and LaPorte knew of and understood PRIDE's management and PRIDE's Board of Directors' reliance on the financial statements of PRIDE and the financial statements of FSW in connection with the financial transactions between PRIDE and FSW described herein.

**V.**
**STANDARD OF CARE**

35.       Defendant owed PRIDE a duty to exercise the degree of care, skill, and diligence exercised by a reasonably prudent certified public accountant practicing in their community or locality.  Auditors owe a duty to perform their services with that degree of skill and competence reasonably expected of persons in their profession in their community.

36.       Audits should be performed in accordance with the Statements on Auditing Standards ("SAS"). These standards provide guidance to external auditors on Generally Accepted Auditing Standards ("GAAS") and general accepted accounting principles with regard to auditing the financial statements of an entity and issuing the auditor's report. Financial statements must be prepared in accordance with accounting principles generally accepted in the United States of America.

37.       AU-C § 230 regarding audit documentation governs the due professional care in the performance of work. Auditors must exercise due professional care in the performance of the audit and the preparation of the report. An auditor should possess "the degree of skill commonly possessed" by other auditors and should exercise it with "reasonable care and diligence." This section also requires that the auditor exercise professional skepticism and have reasonable assurance that the financial statements are free of material misstatement.

38.     AU-C § 265 governs communicating internal control related matters identified in an audit. It is applicable whenever an auditor expresses or disclaims an opinion on financial statements. During the course of an audit, the auditor may become aware of deficiencies in internal control while obtaining an understanding of the entity and its environment, including, but not limited to assessing the risks of material misstatement of the financial statements due to error or fraud. The auditor should evaluate the severity of each deficiency in internal control identified during the audit to determine whether the deficiency, individually or in combination, is a significant deficiency or a material weakness. Deficiencies identified during the audit that upon evaluation are considered significant deficiencies or material weaknesses should be communicated, in writing, to management and those charged with governance as a part of each audit.

39.     AU-C § 560 governs subsequent events and provides that an independent auditor's report ordinarily is issued in connection with historical financial statements that purport to present financial position at a stated date and results of operations and cash flows for a period ended on that date. However, events or transactions that occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements, and that have a material effect on the financial statements require adjustment or disclosure in the statements.

40.     Here, the audits performed by LaPorte were performed in a manner below the standard of care for a Certified Public Accountant practicing in Louisiana. Defendants failed to exercise that degree of skill and learning commonly applied under the same or similar circumstances in Louisiana by a reasonably prudent Certified Public Accountant with the result of injury, loss and damages to PRIDE. Defendants breached their duties owed to PRIDE as a

reasonably prudent auditor and Defendant's breach of their duties to PRIDE was cause-in-fact of PRIDE's actual damages.

## VI.
## CAUSES OF ACTION

### COUNT I.
### Negligence on Behalf of LaPorte

41.     LaPorte failed to comply with the rules of professional conduct established by the Louisiana Accountancy Act No. 473.  LaPorte failed to comply with the AICPA CPA Code of Conduct as required by Title 46, Part XIX, §1700 (5).  Similarly, LaPorte failed to comply with professional standards, including SAS, as required by Title 46, Part XIX, §1703 (A) and §1703(C) and the AICPA Statements on Quality Control Standards (collectively referred to herein as "Generally Accepted US Auditing Standards" or "GAAS").  As a result, PRIDE has been damaged in excess of $ 30 million.

42.     GAAS particularly relevant to the audit failures by LaPorte include the following SASs in effect for audits of financial statements dated as of and for the periods ended December 31, 2013 and 2014:

> AU-C §200, "Overall Objectives of the Independent Auditor and the Conduct of an Audit in Accordance with Generally Accepted Auditing Standards,"

> AU-C §220, "Quality Control for an Engagement Conducted in Accordance with Generally Accepted Auditing Standards,"

> AU-C §230, "Audit Documentation,"

> "AU-C § 265 "Communicating Internal Control Related Matters Identified in an Audit,"

> AU-C §240, "Consideration of Fraud in a Financial Statement Audit;"

> AU-C §250 "Consideration of Laws and Regulations in an Audit of Financial Statements,"

AU-C §325, "Communicating Internal Control Related Matters Identified in an Audit,"

AU §341 "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern,"

AU§ 410 "Adherence to Generally Accepted Accounting Principles,"

AU-C §560, "Subsequent Events and Subsequently Discovered Facts,"

AU-C §570 "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern,"

and

AU-C §705, "Modifications to the Opinion in the Independent Auditor's Report."

43.     Generally accepted Accounting Principles ("GAAP") particularly relevant to the audit failures by LaPorte include the following Financial Accounting Standards Board Accounting Codification Standards in effect for financial statements for the periods ended December 31, 2013 and 2014 ("ASC"):

ASC § 205, "Presentation of Financial Statements,"

ASC § 450 "Contingencies,"

ASC § 460 "Guarantees, FASB Accounting Codification, Volume 1, October 31, 2014,"

ASC § 470 "Debt, FASB Accounting Codification, Volume 1, October 31, 2014"

ASC § 810 "Consolidation,"

ASC § 825 "Financial Instruments," and

ASC § 855 "Subsequent Events."

## SPECIFIC AUDIT FAILURES BY LAPORTE

44.     LaPorte's audits of PRIDE's 2014-2013 Financial Statements failed to detect that the financial statements were materially misstated and not presented in conformity with GAAP.  LaPorte's audits failed to detect that PRIDE's 2014-2013 Financial Statements did

not fairly present PRIDE's financial condition or its results of operations for the years ended December 31, 2014 and December 31, 2013.   LaPorte's audits failed to detect the following material misstatements and/or departures from GAAP:

### *Variable Interest Entity ("VIE") 2014 & 2013 Audit Issue*

45.      PRIDE's 2014 and 2013 financial statements failed to consolidate FSW as required by ASC §810 "Consolidations."   ASC §810-10-25-38A requires the reporting entity to consolidate, or combine, its financial statements with the financial statements of variable interest entities ("VIE"s) as follows:

> "A reporting entity shall be deemed to have a controlling financial interest in a VIE if it has both of the following characteristics:
>
> a.   The power to direct the activities of a VIE that most significantly impact the VIE's economic performance.
>
> b.   The obligation to absorb losses of the VIE that could potentially be significant to the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE." [1]

46.      PRIDE met both of these conditions with respect to FSW in 2014 and 2013.   PRIDE's management held ownership interests in FSW, operated FSW and directed FSW's activities.   PRIDE's management obligated PRIDE to absorb FSW's losses by causing PRIDE to guarantee up to $10 million (later increased to $15 million) of FSW's bank debt.[2]   In addition, PRIDE's management failed to require FSW to post collateral in support of PRIDE's guarantee of FSW's vendor credit accounts, which obligated PRIDE to absorb FSW's credit

---

[1] See, ASC §810-10-25-38A (a) & (b).
[2] See, e.g., Footnote 5 to the 2014 audited financial statements of PRIDE, BATES PRIDE 00070040.

losses, as discussed further below.  LaPorte's 2014 audit identified and attempted to address the VIE audit issue.  However, LaPorte misapplied the guidance in ASC §810-10-25-38A.[3]

47.     LaPorte's 2014 and 2013 audits failed to detect the departures from GAAP noted above by not including FSW in PRIDE's consolidated financial statements.  LaPorte's audits failed to detect these departures from GAAP by focusing exclusively on "[PRIDE's] right to receive benefits from [FSW]…" and not addressing "[PRIDE's] obligation to absorb losses of [FSW]…" as called for in ASC §810-10-25-38A (b).[4]

48.     LaPorte failed to modify its audit opinion in 2014 and 2013 for a material departure from GAAP as required under AU-C §705.07.  LaPorte also failed to comply with AU-C §700.13 through AU-C §700.21.   Additionally, the audit failures above resulted from LaPorte's audit partners failures to properly 1) direct and supervise the audit as required by AU-C §220.17; 2) review the audit as required by AU-C §220.18 & §220.19; and 3) consult as required by AU-C §220.20.

49.     Defendants' failure to consolidate the financial statements of PRIDE and of FSW was a violation of generally accepted accounting principles. If FSW's financial statements had been consolidated with PRIDE's financial statements for reporting purposes, the true financial condition of FSW would have been more apparent to the PRIDE board members and the losses ultimately incurred by PRIDE could have been avoided.

*FSW's Letter of Credit Policy Violation 2014 & 2013 Audit Issue*

---

[3] The auditor that succeeded LaPorte, Postlethwaite & Netterville, APAC concluded that Pride and FSW should be consolidated.  See, "2015 Audit performed by Postlethwaite & Netterville, APAC"
[4] Tufts testified that PRIDE "management makes the assessment regarding variable interest entities" and that LaPorte agreed with the assessment of PRIDE management that "PRIDE was not the primary beneficiary of FSW." See, the Corporate Deposition LaPorte page 166.

50.      PRIDE's 2014 and 2013 audited financial statements failed to disclose that management did not require FSW to post collateral in the form of an irrevocable letter of credit with PRIDE named as the beneficiary or other acceptable collateral.   Instead, management limited PRIDE's disclosures to the following, "[PRIDE] offers a guaranteed payment policy for members purchasing inventory items from specific restaurant equipment manufacturers…"[5] and "…[PRIDE] grants credit to its members.   Each member is required to secure an irrevocable letter of credit with [PRIDE] named as a beneficiary…"[6]

51.      Numerous GAAP pronouncements required PRIDE's management to disclose the collateral policy violation by FSW in PRIDE's audited financial statements.   The following are selected examples:

    a.  ASC §825 "Financial Instruments" required PRIDE's management to disclose "…information about [PRIDE's] access to collateral or other security…"[7]

    b.  ASC §850 "Related Party Transactions" states, "Information about transactions with related parties that would make a difference in decision making shall be disclosed so that users of financial statements can evaluate their significance…"   Further, ASC §850 states, "…The disclosures include…[a] description of the transactions, including transactions to which no amounts or nominal amounts were ascribed… and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements…"[8]

    c.  ASC §450 "Contingencies" states, "Disclosure of the contingency shall be made if there is at least a reasonable possibility that a loss …may have been incurred and…an accrual is not made for a loss contingency…"[9]

    d.  ASC §460 "Guarantees" states, "An entity shall disclose certain loss contingencies even though the possibility of loss may be remote… Examples include… guarantees of indebtedness of others, including indirect guarantees

---

[5] See, e.g., Footnote 1 to the 2014 audited financial statements of PRIDE, BATES PRIDE 00069826.
[6] See, e.g., Footnote 4 to the 2014 audited financial statements of PRIDE, BATES PRIDE 00069830.
[7] See, ASC §825-10-50-21-c-2.
[8] See, ASC §850-10-10-1 and ASC §850-10-50-1.
[9] See, ASC §450-20-50-3.

of indebtedness of others… Other agreements that in substance have the same guarantee characteristic…"[10]

52.     LaPorte's 2014 and 2013 audits failed to report PRIDE's departures from GAAP noted above.  LaPorte did not investigate the existence or amount of any letter of credit as required by PRIDE's policies despite LaPorte flagging this area for special attention when planning the audit.[11]  There is no evidence that LaPorte examined any letters of credit.  LaPorte did not request confirmation from banks of the existence and terms of letters of credit.  These generally accepted auditing procedures would likely have discovered the policy violation by FSW and the related departures from GAAP discussed above.[12]

53.     LaPorte failed to modify its 2014 and 2013 audit opinions for these material departures from GAAP as required under AU-C §705.07.  LaPorte also failed to comply with AU-C §700.13 through AU-C §700.21.  LaPorte's audits failed to effectively execute generally accepted auditing procedures for related party transactions and subsequent events as required by AU-C §550.04 through AU-C §550.07 and AU-C §560.12 through AU-C §560.14. In addition, the failures above resulted from LaPorte's audit partners failures to properly 1) direct and supervise the audit as required by AU-C §220.17; 2) review the audit as required by AU-C §220.18 & §220.19; and 3) consult as required by AU-C §220.20.

### *Callable FSW Debt Guarantee 2014 Audit Issue*

54.     PRIDE's management failed to disclose in PRIDE's 2014 financial statements that FSW was going to violate at least one debt covenant in the loan guaranteed by

---

[10] See, ASC §460-10-50-2.
[11] Tufts understood that PRIDE's procurement policy required all of PRIDE's members, including FSW, to post a letter of credit to secure purchases on behalf of PRIDE's members.  Tufts admitted that she not see anything in LaPorte's audit report that indicated that FSW did not have a letter of credit or other collateral securing PRIDE's guarantee of FSW purchases. Tufts also admitted that she "was not aware that [FSW purchases were] unsecured." See, the Corporate Deposition of LaPorte pages 153-154, 165
[12] See, bates stamp PRIDE 00070511.

PRIDE.   The FSW loan agreement required FSW and PRIDE to submit audited financial statements as soon as available, but in no event later than 258 days after the end of each fiscal year (or by September 15).   PRIDE issued its 2014 audited financial statements on September 14, 2015, before the bank deadline.   However, FSW did not issue its 2014 audited financial statements until October 13, 2015, long after the bank's mid-September deadline.

55.     Several areas of GAAP required PRIDE's management, and FSW's management, to disclose the impending violation by FSW of debt covenants that could potentially obligate PRIDE as guarantor in PRIDE's 2014 financial statements.   For example:

   a.  ASC §460 "Guarantees" required disclosure of "…The events and circumstances that would require the guarantor to perform under the guarantee… The current status of the payment/performance risk of the guarantee [and]… The maximum potential amount of future payments (undiscounted) that the guarantor could be required to make under the guarantee…"[13]

   b.  ASC §855 "Subsequent Events" states, "Some non-recognized subsequent events may be of such a nature that they must be disclosed to keep the financial statements from being misleading.   For such events, an entity shall disclose…the nature of the event [and] an estimate of its financial effect, or a statement that such as estimate cannot be made."[14]

56.     LaPorte's 2014 audit failed to detect PRIDE's departures from GAAP noted above.   LaPorte's audit working papers contained documentation of the bank's mid-September deadline to submit audited financial statements; however, there is no indication that LaPorte considered how missing this deadline could affect PRIDE's financial statements. LaPorte did not request that FSW obtain a bank waiver as it had done in the prior year audit. LaPorte did not explain why it failed to investigate the circumstances surrounding the callable debt guarantee despite having documentation of this audit issue in its working papers.

---

[13] See, ASC §460-10-50-4.
[14] See, ASC §855-10-50-2.

57.       LaPorte failed to modify its audit opinion in 2014 for a material departure from GAAP as required under AU-C §705.07.  LaPorte also failed to comply with AU-C §700.13 through AU-C §700.21.  Further, LaPorte failed to effectively execute generally accepted auditing procedures for related party transactions and subsequent events as required by AU-C §550.04 through AU-C §550.07 and AU-C §560.12 through AU-C §560.14.  In addition, the failures above resulted from LaPorte's audit partners failures to properly 1) direct and supervise the audit as required by AU-C §220.17; 2) review the audit as required by AU-C §220.18 & §220.19; and 3) consult as required by AU-C §220.20.

### Acceleration of Guaranteed Debt 2014 Audit Issue

58.       In 2014, PRIDE's management failed to disclose that the maturity date of the FSW bank debt guaranteed by PRIDE was October 2015 and that uncertainties existed regarding FSW's ability to renew or refinance the guaranteed loan.  In prior years, FSW's loan renewed annually for a period that extended the due date more than one year from the reporting date.  However, IberiaBank changed and reduced the maturity date to six months in April 2015.  Management sought to refinance FSW's debt with JPMorgan Chase Bank, N.A. ("Chase").  Chase performed lender due diligence on site at the same time and location where LaPorte conducted its audit fieldwork.  Chase completed its work prior to the completion of LaPorte's 2014 audit.  Chase's report raised substantial uncertainties regarding FSW's ability to replace the IberiaBank debt guaranteed by PRIDE.[15] As noted above, ASC §460 "Guarantees," ASC §855 "Subsequent Events," ASC §850 "Related Parties," ASC §450 "Contingencies," ASC §825 "Financial Instruments," and ASC §815 "Consolidations" all required PRIDE's management to disclose the effects of FSW's financial difficulties on PRIDE.

---

[15] See, e.g., "The quality of the books and records of FSW are not adequate to prepare a proper borrowing base for Chase Bank.  Limitations were noted in A/R, Inventory and Financial reporting…" Chase Field Examination Report, BATES JPM000838.

59.     LaPorte's audit failed to detect PRIDE's departures from GAAP noted above.  LaPorte's audit working papers contained documentation of IberiaBank changing the maturity date of the FSW loan guaranteed by PRIDE from one year to six months meaning FSW needed to secure replacement debt by October 2015.  Banks typically shorten the term at renewal as opposed to terminating a credit line in order to give borrowers and their guarantors time to obtain replacement debt.  This is commonly known as the bank "slow walking" the customer out of the bank.  LaPorte auditors knew or should have known that Chase completed its lender due diligence before the date of the 2014 LaPorte audit report.  However, LaPorte's 2014 audit working papers showed no investigation into Chase's due diligence or FSW's ability to obtain replacement debt.  The working papers also did not contain audit evidence[16] that LaPorte considered the potential impact of FSW being "slow walked" out of IberiaBank without securing a replacement lender on PRIDE – which obviously would (and did) cause a financial disaster.  Moreover, LaPorte did not explain why it did not perform any of the above, despite having documentation of the audit issue in its working papers.

60.     LaPorte failed to modify its audit opinion in 2014 for a material departure from GAAP as required under AU-C §705.07.  LaPorte also failed to comply with AU-C §700.13 through AU-C §700.21.  LaPorte also failed to effectively execute generally accepted auditing procedures for related party transactions and subsequent events as required by AU-C §550.04 through AU-C §550.07 and AU-C §560.12 through AU-C §560.14.  In addition, the failures above resulted from LaPorte's audit partners failures to properly 1) direct and supervise

---

[16] See e.g., AU-C 230.02 which states, "Audit documentation that meets the requirements of this section and the specific documentation requirements of other relevant AU-C sections provides a. evidence of the auditor's basis for a conclusion about the achievement of the overall objectives of the audit; and b. evidence that the audit was planned and performed in accordance with generally accepted auditing standards in accordance with generally accepted auditing standards (GAAS) and applicable legal and regulatory requirements."

the audit as required by AU-C §220.17; 2) review the audit as required by AU-C §220.18 & §220.19; and 3) consult as required by AU-C §220.20.

### *Going Concern Uncertainty Audit Issue*

61.     Moreover, PRIDE's management failed to disclose its evaluation of and plan to address warning signs regarding PRIDE's ability to continue as a going concern.  There were red flags that clearly indicated that PRIDE might not be able to meet its obligations as they came due as of LaPorte's audit report date of September 14, 2014.  For example, FSW debt guaranteed by PRIDE was maturing in 30 days, and FSW had no means to pay the debt when due.  In addition, FSW management would violate its bank-reporting deadline for this debt on September 15, 2014, which placed the loan in technical default.  Moreover, PRIDE had no collateral (letter of credit or equivalent) to support its guarantee of FSW vendor credit, which was required by PRIDE's Shareholder Agreement.

62.     ASC §205 "Presentation of Financial Statements" required PRIDE management to evaluate these conditions and make disclosures regarding its evaluation of and plans related to addressing these conditions.  For example:

   a.  "Management shall evaluate relevant whether conditions and events, considered in the aggregate, indicate that it is probable that an entity will be unable to meet its obligations as they become due within one year after the date that the financial statements are issued…"[17]

   b.  "Management's evaluation shall be based on relevant conditions and events that are known and reasonably knowable at the date that the financial statements are issued."[18]

   c.  PRIDE management was required to disclose "Principal conditions or events that raised substantial doubt about the entity's ability to continue as a going concern (before consideration of management's plans)…  Management's

---

[17] See, ASC §205-40-50-4.
[18] See, ASC §205-40-50-3.

evaluation of the significance of those conditions or events in relation to the entity's ability to meet its obligations…" and "Management's plans that alleviated substantial doubt…" or  "Management's plans that are intended to mitigate the conditions…"[19]

63.     LaPorte's 2014 audit failed to detect the departures from GAAP noted above.  LaPorte's 2014 audit strategy did not contain procedures designed to address PRIDE's ability to continue as a going concern – despite its having knowledge of the various financial difficulties discussed above.[20]  Moreover, LaPorte failed to respond and expand its audit plan to investigate unfavorable developments that occurred prior to the release of its audit opinion on PRIDE's 2014 financial statements.

64.     LaPorte failed to modify its audit opinion in 2014 for a material departure from GAAP as required under AU-C §705.07.  LaPorte also failed to comply with AU-C §700.13 through AU-C §700.21.  LaPorte's audit failed to execute generally accepted auditing procedures required to evaluate PRIDE's ability to continue as a going concern as required by AU-C §570 despite the numerous warning signs of financial distress that are documented in LaPorte's 2014 audit working papers.  LaPorte also failed to effectively execute generally accepted auditing procedures for related party transactions and subsequent events as required by AU-C §550.04 through AU-C §550.07 and AU-C §560.12 through AU-C §560.14.  In addition, the failures above resulted from LaPorte's audit partners failures to properly 1) direct and

---

[19] See, ASC § 205-40-50-13 and 14.

[20] Tufts testified that "nothing came to our attention that raised substantial doubt regarding FSW's ability to maintain operations for one year from the balance sheet date" (12/31/2014). On the Summary of Significant Audit Findings and Issues, Anthony Rutledge ("Rutledge") of LaPorte answered "No" to the inquiry about whether there were any conditions or events that indicated substantial doubt about the entity's ability to continue as a going concern. Rutledge recorded his "No" response regarding going concern on August 25, 2015. Tracy Tufts ("Tufts") reviewed the Summary of Significant Audit Findings and Issues on September 10, 2015, and Cheryl Haspel ("Haspel") of LaPorte reviewed it on October 14, 2015. See, the Corporate Deposition of LaPorte page 119 and Exhibit 16 of the Corporate Deposition of LaPorte, bates stamps PRIDE 00005118-5124.

supervise the audit as required by AU-C §220.17; 2) review the audit as required by AU-C §220.18 & §220.19; and 3) consult as required by AU-C §220.20.

### *Failure to Plan, Direct, Supervise & Review PRIDE's Audits Engagements*

65.     Each of the previously mentioned audit failures resulted from LaPorte's audit partners failure to properly 1) plan the audits as required by AU-C §300; 2) direct and supervise the audits as required by AU-C §220.17; 3) review the audits as required by AU-C §220.18 & §220.19; and 4) properly consult as required by AU-C §220.20.  For example:

    a.  Rutledge, Manager, prepared the audit plan on June 15, 2015 and Jaclyn Broussard ("Broussard"), Senior Manager, reviewed and approved the plan on July 20, 2015.  However, Daniel Williams ("Williams"), Partner, did not review the audit planning until September 2, 2015 and Haspel, Independent Reviewer, did not review the audit planning or audit fieldwork until September 15, 2015.[21]

    b.  Audit fieldwork was largely completed by July 20, 2015 based on the review of Broussard, Senior Manager.  However, Williams, Partner, did not review the audit fieldwork until the early-September 2015 timeframe.  LaPorte's working papers contain no evidence[22] that Williams, Partner, was involved in planning, directing or supervising the 2014 audit of PRIDE as the audit was performed.

---

[21]  The 2014 audit report was finalized on September 14, 2015. Audit working papers indicate that Haspel's independent review of the 2014 audit program was not complete prior to the issuance of the 2014 audit report. See, PRIDE 00070252 and PRIDE 00070087.

c. LaPorte's audit working papers also contain no meaningful evidence[22] that Tufts, Partner, participated in directing, supervising or finalizing LaPorte's 2014 audit of PRIDE.[22, 23]

d. LaPorte failed to consult with accounting technical resources in its 2014 audit regarding PRIDE's failure to consolidate FSW, failure to disclose that the FSW debt was callable, failure to disclose the acceleration of the FSW debt's maturity date and failure to disclose PRIDE's collateral policy violation by FSW.

e. LaPorte failed to consult with audit technical resources regarding failing to audit member collateral and failing to evaluate PRIDE's ability to continue as a going concern and related disclosures.

f. According to LaPorte's internal policies, the engagement leader should "assure that the engagement is planned on a timely basis, fieldwork is controlled, and the required reviews take place on a timely basis."   Yet, Williams and Tufts, Partners, only spent 3.25 hours on planning, or 1.2% of the total time, and 15 minutes supervising fieldwork.   Further, Tufts spent only 15 minutes reviewing the audit at the end of the engagement.[24]

---

[22] See, e.g., Bates numbers PRIDE 00069854, PRIDE 00069859, PRIDE 00069901, PRIDE 00069908, PRIDE 00069914, PRIDE 00069920, PRIDE 00069928, PRIDE 00069948, PRIDE 00069953, PRIDE 00069979, PRIDE 00069985, PRIDE 00070003, PRIDE 00070010, PRIDE 00070020, PRIDE 00070087, PRIDE 00070252, PRIDE 00070410, PRIDE 00070469, PRIDE 00072347, PRIDE 00073730, PRIDE 00073744, PRIDE 00073893, PRIDE 00074152, PRIDE 00074175 and PRIDE 00074200.

[23] Tufts testified that Rutledge should have gone back and corrected his response in the FSW 0160 Summary of Significant Audit Findings or Issues regarding whether the financial statements were restated to correct a prior period error. Rutledge responded, "No" to question no. 3 under Accounting Matters ("were the financial statements restated during the current period to correct a prior period error"). Tufts admitted that LaPorte's answer in the form "should have been corrected" to respond "Yes" because prior period errors in FSW's financial statements regarding rebate revenue were, in fact, corrected. See, the Corporate Deposition of LaPorte pages 223-226 and Exhibit 16 of the Corporate Deposition of LaPorte, bates stamps PRIDE 00005118-5124.

[24] See bates LAPORTE SUPPLEMENTAL PRODUCTION 000291 - 000308 and 000355 of "01-31-2019 LAPORTE SUPPLEMENTAL PRODUCTION 10448642xA8A8F (1).pdf."

g.  Tufts delegated final review of the 2013 and 2014 PRIDE audits to Williams, Partner.[25]  Williams did not participate in the 2014 fieldwork, and as shown in the LaPorte time records, he had very little involvement in planning. Tufts testified that due to scheduling and timing she did not have time to review the PRIDE file.[26]  Tufts was the engagement director on the PRIDE audits, and she testified that she was "responsible for the engagement which means scheduling, planning and reviewing the file."[27]  For the 2014 PRIDE audit, Tufts was too busy and did not have time to work on the PRIDE audit, and she brought in Williams to do the review.[28]

h.  LaPorte was aware of PRIDE's $10 million guaranty of FSW's line of credit. Tufts testified that she was aware of the guaranty, and that it was identified in the footnotes to PRIDE's financial statements (See Footnote 5, Commitments). Although PRIDE had guaranteed $10 million of FSW's line of credit with IberiaBank, Tufts testified that she did not know whether the PRIDE board would have an interest in the financial status of FSW.  Tufts explained that PRIDE "management did not inform us or let us know that-- PRIDE would be relying on our audit opinion of FSW."[29]  This statement by Tufts makes no sense because LaPorte's work papers supporting its 2014 audit of PRIDE are replete with references to the fact that FSW is a related party, a major customer and that PRIDE guaranteed FSW's debt.

---

[25] See, the Corporate Deposition of LaPorte pages 52-54.
[26] See, the Corporate Deposition of LaPorte pages 51-52, 61-62.
[27] See, the Corporate Deposition of LaPorte pages 52-53.
[28] See, the Corporate Deposition of LaPorte pages 61-62.
[29] See, the Corporate Deposition of LaPorte pages 75-76, 78.

## COUNT II.
## NEGLIGENT MISREPRESENTATION

Plaintiff PRIDE re-alleges the foregoing paragraphs and incorporates them herein as if fully set forth verbatim.  Defendant LaPorte in the course of its profession as auditors in which it has a pecuniary interest, supplied false information for the guidance of PRIDE and its Board of Directors and Members in their business transactions.

66.     LaPorte, as auditors for PRIDE, had a legal duty to supply correct information to PRIDE, and its members and Board of Directors.  Defendant LaPorte breached its duty and PRIDE and its' Board of Directors and members suffered damages and pecuniary loss as a result of the justifiable reliance by PRIDE upon the omissions and affirmative false representations of Defendant LaPorte.

## COUNT III.
## BREACH OF CONTRACT

67.     Plaintiff PRIDE re-alleges the foregoing paragraphs and incorporates them herein as if fully set forth verbatim.  The facts set out above demonstrate that Plaintiff and LaPorte had a valid, written contract and that LaPorte materially breached that contract.  The essential elements of a breach of contract claim are (1) the obligor's undertaking of an obligation to perform, (2) the obligor failed to perform the obligation, and (3) the failure to perform resulted in damages to the obligee.  *See* La. Civ. Code art. 1994; *Denham Homes, L.L.C. v. Teche Federal Bank*, 2014-1576 (La. App. 1 Cir. 9/19/15), 182 So.3d 108, 119; *Favrot v. Favrot,* 10–0986 (La.App. 4th Cir.2/9/11), 68 So.3d 1099, 1108–09, *writ denied,* 11–0636 (La.5/6/11), 62 So.3d 127.

68.     Defendant LaPorte undertook an obligation to perform an audit of PRIDE's financial statements for the years ended in December 31, 2013 and December 31, 2014. In connection with this obligation, LaPorte promised to timely communicate, in writing, their discovery of any fraud causing a material misstatement of the financial statements, any instances of noncompliance with laws and regulations that might come to their attention, any significant deficiencies or material weaknesses in internal control that might become known to them during the course of the audit, and any other matters arising from the audit deemed significant and relevant to the Board and the members of PRIDE in their oversight of the financial reporting process.  LaPorte failed to perform its obligation by failing to detect that PRIDE's financial statements were materially misstated and not presented in conformity with GAAP.   LaPorte's failures resulted in damages in excess of $30 million incurred by PRIDE.

## VII.
## DAMAGES

69.     As a result of the acts and omissions and breaches of the applicable standard of care owed by LaPorte and the other Defendants to PRIDE, negligent misrepresentations made by Defendants and the breach of contract by LaPorte, PRIDE has sustained damages in excess of $30 million

WHEREFORE, PRIDE demands a jury trial and seeks a judgment in its favor and against Defendants LaPorte, A Professional Accounting Corporation, Cheryl Haspel, Tracy Tufts, Anthony M. Rutledge, Terri Troyer, Michael Simon and Continental Casualty Company, on all claims, and for an award of all damages caused by Defendants as stated above and as may

be shown at the time of the trial, including interest and all cost; PRIDE further prays for such

other and further relief to which it may be entitled and as this Court deems appropriate.

Respectfully submitted,


  /s/  *R. Joshua Koch*
**R. JOSHUA KOCH, JR**. (#07767)
**KOCH & SCHMIDT, LLC**
650 Poydras Street, Suite 2660
New Orleans, Louisiana 70130
Telephone: (504) 208-9040
Facsimile:   (504) 208-9041
*jkoch@kochschmidt.com*

***Attorneys for Plaintiff***
***PRIDE Centric Resources, Inc.***